UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| LENZIE M. BURNEY, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
|     v. | )   CAUSE NO. 1:06-CV-00266 |
| | ) |
| MICHAEL J. ASTRUE,[1] | ) |
| Commissioner of Social Security, | ) |
| | ) |
|     Defendant. | ) |

## OPINION AND ORDER

Plaintiff Lenzie Burney, who is proceeding *pro se*, appeals to the district court from a final decision of the Commissioner of Social Security ("Commissioner") denying his application under the Social Security Act (the "Act") for a period of disability and Disability Insurance Benefits ("DIB").[2] (*See* Docket # 1.)  For the reasons set forth herein, the Commissioner's decision will be AFFIRMED.

## I.  PROCEDURAL HISTORY

Burney applied for DIB on March 31, 2003, alleging that he became disabled as of August 12, 2002, which he later amended to January 3, 2003. (Tr. 9, 27, 29-30, 62, 65-74.)  The Commissioner denied his application initially and upon reconsideration, and Burney requested an administrative hearing. (Tr. 17-22, 50-59.)  On May 4, 2005, Administrative Law Judge ("ALJ") Yvonne K. Stam conducted a hearing at which Burney, who was represented by counsel

---

[1] On February 12, 2007, Michael J. Astrue became the Commissioner of Social Security, and thus he is automatically substituted for Jo Anne B. Barnhart as the Defendant in this case. 42 U.S.C. § 405(g); Fed. R. Civ. P. 25(d)(1).

[2] All parties have consented to the Magistrate Judge. *See* 28 U.S.C. § 636(c).

at the time, and a vocational expert testified. (Tr. 23-49.)  On January 27, 2006, the ALJ rendered an unfavorable decision to Burney, concluding that he was not disabled because despite the limitations caused by his impairments, he could perform a significant number of jobs in the economic region. (Tr. 7-16.)  The Appeals Council denied Burney's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 3-8.)

Accordingly, Burney filed a complaint with this Court on July 27, 2006, seeking relief from the Commissioner's final decision. (Docket # 1.)  This appeal became ripe for the Court's review as of March 15, 2007. (*See* Docket # 14-18.)

## II.  FACTUAL BACKGROUND[3]

### A.  Background and Daily Activities

At the time of the ALJ's decision, Burney was fifty-three years old, had a high school education, and had worked from 1985 until 2003 as a press operator. (Tr. 16, 60, 67, 72.) Burney alleged in his DIB application that he became disabled due to low back pain, deteriorating eyesight secondary to Eales disease,[4] and carpal tunnel syndrome. (Tr. 11, 66.)

At the hearing, Burney testified that he lives with his wife, twenty-three year old stepson, and sixteen-year old daughter. (Tr. 26-27.)  In describing his typical day, Burney stated that he rises at 7:00 a.m. and often takes a brief walk outside. (Tr. 32.)  He then performs light housework such as dusting or basic food preparation; however, he punctuates these activities with periods of relaxation, including listening to the radio, "watch[ing] the cars down Paulding

---

[3] The administrative record in this case is voluminous (369 pages), and the parties' disputes involve only small portions of it.  Therefore, in the interest of brevity, this opinion recounts only the portions of the record necessary to the decision.

[4] Eales disease is "peripheral retinal periphlebitis causing recurrent retinal or intravitreous hemorrhages in young adults." *Stedman's Medical Dictionary* 555 (Lippincott Williams & Wilkins, 28th ed. 2006).

2

[sic] Road," or watching television with his wife. (Tr. 32-33.)  Burney reported that sometimes a friend will come to visit with him and that he often goes with his family to Walmart, where they walk around the store for several hours. (Tr. 33-34.)  In the evening, he stated that he watches television, retiring around 8:30 p.m. (Tr. 34.)

As to his problems with his eyesight, Burney explained that he experiences "blurriness" in his vision, that he sees "dots," and that at times he has double vision. (Tr. 35, 37.)  For example, he stated that he will frequently bump into someone when pushing a cart at a store because he "can't see them." (Tr. 35.)  He also reported that he cannot read a newspaper because of his vision problems, though he can see a blurred "little figure of the word."[5] (Tr. 36.)  He further explained that his vision problems are not aided by either low or bright lighting and that his vision is best when he looks straight ahead. (Tr. 38-39.)

As to his back limitations, Burney stated that he has "constant" pain that extends through his legs and that he has swelling in his hands and feet. (Tr. 30-31.)  On a ten-point scale with "zero" being no pain and "ten" being pain that would cause him to go to an emergency room, Burney explained that his pain at its worst is a "seven" and at its best is a "six." (Tr. 30-31.)  He reported that he can sit for about thirty to forty minutes, that he can stand for about ten minutes, and that he can walk for about ten to fifteen minutes. (Tr. 31.)  Burney further reported that he can lift between five and ten pounds. (Tr. 32.)

---

[5] Burney clarified to the ALJ that he has the ability to read, that is, that he is not illiterate, but that the small newspaper print is "blurry." (Tr. 36.)

*B. Summary of the Medical Evidence*

1. <u>Vision Impairment</u>

In 1998, Jonathan Walker, M.D., an ophthalmologist, diagnosed Burney with Eales disease and subsequently operated on his left eye to relieve hemorrhaging. (Tr. 114-15.) Burney then underwent laser treatment on his right eye. (Tr. 108.) Dr. Walker saw Burney on an annual basis thereafter. (Tr. 105-09.)

In February 2004, Dr. Walker reported that in between intermittent vitreous hemorrhaging from his Eales disease, Burney's vision "should be relatively stable." (Tr. 332.) He opined that aside from a major hemorrhage, he did "not foresee a lot of significant problems with [Burney's] central vision." (Tr. 332.) He did note, however, that Burney may have "trouble with contrast sensitivity in low light situations" and may have "a little bit of decreased side vision as a result of vascular damage," which he doubted was significant. (Tr. 332.)

In March 2004, Kevin Whiteleather, O.D., an optometrist, examined Burney on behalf of the state agency. (Tr. 331.) Dr. Whiteleather opined: "While [Burney] has a less than perfect visual field, I would not consider it to be constricted enough to be a disability at this time." (Tr. 331.) He further stated:

> [Burney] has multiple small scotomoas throughout his visual field right eye more than left. While these results do not classify him as legally blind, his visual fields are restricted, and the blind spots would be a safety issue in many work conditions. It would not be recommended for him to be in a workplace environment around fast moving equipment or dangerous machinery.

(Tr. 330.)

In April 2005, based solely on his March 2004 evaluation, Dr. Whiteleather completed a residual functional capacity questionnaire on Burney's behalf. (Tr. 364-65.) He reported that

4

Burney had difficulty with bright light and problems with glare, that he had "[s]mall blind spots throughout [his] visual field" and a decrease in his visual field, and that his eyes "fatigue easily." (Tr. 364.)  He concluded that Burney could "rarely" perform work that required near acuity, far acuity, depth perception, and accommodation, and that he could frequently perform work involving field of vision; however, at the same time Dr. Whiteleather stated that Burney could perform work involving small objects. (Tr. 366.)  He further opined that Burney could never perform work that required bending or crouching. (Tr. 365-66.)  Dr. Whiteleather concluded that Burney's symptoms were severe enough to interfere "occasionally" with the attention and concentration needed to perform even simple work tasks. (Tr. 365.)

2.  Back Impairment

In August 2002, Burney injured his back at work. (Tr. 27-28, 157.)  An MRI showed a bulging disk in the low back that likely compromised a spinal nerve. (Tr. 145.)  A functional capacity evaluation showed a 27.6% composite functional strength deficit. (Tr. 161.)  Based on the functional capacity evaluation and his clinical examinations, Dr. Thomas Lazoff assigned Burney the following permanent work restrictions:

| Activity | Occasional | Frequent | Constant |
|---|---|---|---|
| Lifting from floor to waist level | 70 lbs. | 40 lbs. | |
| Lifting from waist to shoulder level | 50 lbs. | 25 lbs. | 20 lbs. |
| Shoulder to overhead | 35 lbs. | 15 lbs. | 10 lbs. |
| Carrying | 25-35 lbs. | 15 lbs. | |
| Pushing/pulling | 80 lbs. | 40 lbs. | |

(Tr. 234.)  He further stated that Burney could "frequently" stand, walk, sit, stoop, bend, kneel, crawl, and climb, but that he could "constantly" squat and balance. (Tr. 234.)

5

In March 2003, Dr. Michael Holton examined Burney on behalf of the state agency. (Tr. 190-93.)  Dr. Holton observed that Burney demonstrated an antalgic gait favoring his left lower extremity with mild associated slowing, as well as instability when walking on heels, toes, and tandem walking. (Tr. 191.)  Hopping and squatting were omitted due to safety concerns. (Tr. 191.)  Dr. Holton noted palpable tenderness of the lumbar paravertebrals and that Burney guarded his left hip upon active range of motion testing. (Tr. 191.)  He also noted that Burney had normal muscle strength, no muscle spasms, and intact sensory responses, but that he had diminished deep tendon reflexes. (Tr. 191-92.)

On June 30, 2003, Dr. J. Gaddy reviewed Burney's record on behalf of the state agency and opined that Burney retained the residual functional capacity ("RFC") to lift twenty pounds occasionally and ten pounds frequently; stand and/or walk for about six hours in an eight-hour workday; sit for about six hours in an eight-hour workday; perform unlimited pushing/pulling; and occasionally climb, balance, stoop, kneel, crouch, and crawl. (Tr. 194-201.)

3.  Carpal Tunnel Syndrome

In April 2003, Burney complained of right arm pain after stressing it at work four months earlier. (Tr. 180.)  He was diagnosed with carpal tunnel syndrome and underwent surgery for it on August 26, 2003. (Tr. 209-10.)  He was released to work without restrictions in November 2003. (Tr. 316.)

### C.  Vocational Expert's Testimony

At the hearing, the ALJ asked the vocational expert to assume a claimant of the same age, education, and work experience as Burney, who had the exertional RFC for light work and the non-exertional RFC for work which accommodated decreased peripheral vision, trouble with

6

contrast sensitivity in low-light situations, no exposure to fast-moving equipment or dangerous machinery, no work with small objects, and no reading small type. (Tr. 40-44.)  The vocational expert stated that such an individual could work as a sales attendant (1,750 jobs in the region), small parts assembler (600 jobs in the region), and assembly machine tender (400 jobs in the region), which the ALJ considered to be a significant number of jobs. (Tr. 9-16, 45.)

Burney's attorney then asked the vocational expert whether the hypothetical individual would be able to perform those jobs if he had the severe visual limitations that Burney testified to, that is, that the hypothetical individual could not see people correctly and that he could not read a newspaper. (Tr. 47-48.)  The vocational expert responded: "[If] his eyesight's so bad that he can't make out even large objects, like people, then I don't believe any of those jobs would be appropriate, or indeed, any other jobs would be appropriate." (Tr. 48.)

### III.  STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted).  The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative

record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Clifford*, 227 F.3d at 869.

## IV.  ANALYSIS

### *A.  The Law*

Under the Act, a claimant is entitled to DIB if he establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform his past work; and (5) whether the claimant is incapable of performing work in the national economy.[6] *See* 20 C.F.R. § 404.1520; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). An affirmative answer leads

---

[6] Before performing steps four and five, the ALJ must determine the claimant's RFC, or what tasks the claimant can do despite his limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. § 404.1520(e).

either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

### B. The ALJ's Decision

On January 27, 2006, the ALJ rendered her opinion. (Tr. 9-16.) She found at step one of the five-step analysis that Burney had not engaged in substantial gainful activity after his amended onset date of January 3, 2003, and at step two that he had severe impairments with respect to his back pain, carpal tunnel syndrome, and Eales disease with hemorrhages. (Tr. 11.) However, at step three, she determined that Burney's impairments were not severe enough to meet a listing. (Tr. 12.) Before proceeding to step four, the ALJ determined that Burney's testimony concerning the intensity, duration, and limiting effects of his symptoms was "not entirely persuasive" and thus assigned the following RFC:

> to lift and carry twenty pounds occasionally, ten pounds frequently, stand and walk in combination about six hours in an eight hour workday, but with no climbing of ladders, ropes or scaffolds, and requiring no working with small objects or reading small type and no exposure to hazards.

(Tr. 12.) Based on this RFC, the ALJ concluded at step four that Burney could not perform his past relevant work as a press operator. (Tr. 14.) The ALJ then proceeded to step five where she determined that, considering his age, education, and experience, Burney could perform a significant number of other jobs within the economic region, including working as a sales attendant (1,750 jobs), small parts assembler (600 jobs), and assembly machine tender (400 jobs). (Tr. 15.) Therefore, Burney's claim for DIB was denied. (Tr. 15.)

Burney contends, however, in his hand-written, one-paragraph opening brief that the ALJ erred in assigning him an RFC that indicated he could perform a significant number of jobs in the region despite the limitations caused by his impairment.[7] (Pl.'s Opening Br. at 1.)  As will be explained herein, Burney's conclusory assertion does not merit a remand of the Commissioner's final decision.

### C.  The ALJ's RFC Determination Is Supported by Substantial Evidence

Although an ALJ may ultimately decide to adopt the opinions expressed in a medical source statement concerning the ability of a claimant to perform work-related activities, the RFC assessment is an issue reserved to the ALJ. 20 C.F.R. § 404.1527(e); SSR 96-5p.  The RFC assessment "is based upon consideration of *all* relevant evidence in the case record, including medical evidence and relevant nonmedical evidence, such as observations of lay witnesses of an individual's apparent symptomology, an individual's own statement of what he or she is able or unable to do, and many other factors that could help the adjudicator determine the most reasonable findings in light of all the evidence." SSR 96-5p (emphasis added); *see* 20 C.F.R. § 404.1545.  Thus, a medical source opinion concerning a claimant's work ability is *not* determinative of the RFC assigned by the ALJ. *See* SSR 96-5p ("[A] medical source statement must not be equated with the administrative finding known as the RFC assessment.") (emphasis added).

Here, the ALJ concluded that Burney had the exertional RFC to perform light work, which requires the ability to lift twenty pounds occasionally, lift ten pounds frequently, and stand and/or

---

[7] Burney's opening brief in its entirety states: "[The vocational expert] said, in the hearing when he stated those jobs and finally came to[] the conclusion that with my limitations that there were know [sic] jobs out there, that I could do.  I don't believe that the judge were [sic] fair in her decision." (Opening Br. at 1.)  Burney failed to file a reply brief. (*See* Docket # 18.)

walk six hours out of an eight-hour workday, but with no climbing of ladders, ropes, or scaffolds. *See* SSR 83-10.  This exertional RFC assigned by the ALJ is actually slightly *more* restrictive than the permanent limitations assigned by Dr. Lazoff, Burney's treating orthopaedist, who opined that Burney could occasionally lift twenty-five pounds; could frequently lift fifteen pounds; could frequently stand, walk, sit, stoop, bend, kneel, crawl, and climb; and could constantly squat and balance.  Moreover, the RFC assigned by the ALJ, as well as the opinion of Dr. Lazoff, do not conflict with the opinion of Dr. Hicks, who assigned Burney *no* restrictions with respect to his carpal tunnel syndrome, or with the opinion of the reviewing state agency physician, who concluded that Burney was capable of performing light work with no climbing ladders, ropes, or scaffolds. *See* 20 C.F.R. § 404.1527(d)(2*)*; *Johansen v. Barnhart*, 314 F.3d 283, 287 (7th Cir. 2002); *Clifford*, 227 F.3d at 870 ("[A] treating physician's opinion regarding the nature and severity of a medical condition is entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record.").  Thus, the exertional RFC assigned to Burney by the ALJ is indeed consistent with the medical opinions of record.

As to Burney's visual impairments, the ALJ assigned Burney a non-exertional RFC that restricted him from working with small objects, reading small type, or exposing him to hazards. This RFC encompassed all of the limitations assigned to him by Dr. Walker, his treating ophthalmologist, and many of the limitations assigned to him by Dr. Whiteleather, the examining optometrist.

To elaborate, the ALJ's path of reasoning to adopt only a portion of the limitations assigned by Dr. Whiteleather is easily traced. *See Rohan v. Chater*, 98 F.3d 966, 971 (7th Cir.

11

1996) (stating that an ALJ must sufficiently articulate his or her assessment of the evidence to assure that the important evidence has been considered and that the ALJ's path of reasoning can be traced). First, the ALJ observed that Dr. Whiteleather only examined Burney one time. *See* 20 C.F.R. § 404.1527(d)(2); *Micus v. Bowen*, 979 F.2d 602, 608 (7th Cir. 1992) ("[T]he ALJ must take into account the treating physician's ability to observe the claimant over a longer period.").

The ALJ next explained that he perceived Dr. Whiteleather's opinion concerning Burney's visual limitations to "contain[] some inconsistencies," because Dr. Whiteleather stated that Burney could "rarely" perform work that requires far acuity and near acuity but also stated that Burney could work with small objects. (Tr. 14); *see* 20 C.F.R. § 404.1527(d)(4); *Knight v. Chater*, 55 F.3d 309, 314 (7th Cir. 1995) ("Medical evidence may be discounted if it is internally inconsistent or inconsistent with other evidence."). Finally, the ALJ discounted Dr. Whiteleather's opinion concerning Burney's ability to stoop and crouch, finding it "beyond his scope of expertise."[8] (Tr. 14); *see* 20 C.F.R. § 404.1527(d)(2)(ii) ("[I]f your ophthalmologist notices that you have complained of neck pain during your eye examinations, we will consider his or her opinion with respect to your neck pain, but we will give it less weight than that of another physician who has treated you for the neck pain."); *White v. Barnhart*, 415 F.3d 654, 660 (7th Cir. 2005) (upholding the ALJ's decision to discount a physician's opinion "when he strayed from his area of expertise").

Additionally, though the ALJ omitted Dr. Whiteleather's limitations of decreased

---

[8] While it is possible that Dr. Whiteleather's restriction as to stooping and crouching stemmed from Burney's eye problem, Dr. Whiteleather responded "Not Applicable" when asked to explain whether the limitation was connected to Burney's eye problem and when asked to describe the medical basis for this limitation. (Tr. 366.) Thus, Dr. Whiteleather failed to support this limitation with objective medical evidence. *Knight*, 55 F.3d at 313-14 (collecting cases stating that a physician's opinion may be discounted if it is not supported by sufficient clinical findings).

peripheral vision and trouble with contrast sensitivity in low-light situations when he ultimately articulated Burney's RFC, the ALJ *did* include them in the hypothetical that he posed to the vocational expert. (*Compare* Tr. 12, *with* Tr. 40-45.)  As a result, these additional limitations were considered when the vocational expert determined that 2,750 jobs were available to the hypothetical individual, which the ALJ considered to be a significant number of jobs. *See Shramek v. Apfel*, 226 F.3d 809, 814 (7th Cir. 2000) (finding that the ALJ's decision was supported by substantial evidence because his hypothetical included all of the treating physician's limitations, even though he improperly rejected these limitations in his opinion); *Kelley v. Sullivan*, 890 F.2d 961, 965 (7th Cir. 1989) (discarding a claimant's contention that the ALJ erred by excluding a sit/stand option since the vocational expert testified at the hearing that there were a significant number of jobs available in the economy which offered a sit/stand option); *see generally McLachlan v. Barnhart*, No. 03 C 2297, 2004 WL 2036294, at *10 (N.D. Ill. Sept. 8, 2004) ("[T]he ALJ was entitled to rely upon the opinion of the vocational expert that there are a significant number of jobs in the economy that [claimant] could perform." (quoting *Harris v. Barnhart*, 356 F.3d 926, 931 (8th Cir. 2004))).  Therefore, Burney's limitations concerning decreased peripheral vision and trouble with contrast sensitivity in low-light situations were accommodated in the ALJ's step five analysis.

      Moreover, Burney seemingly contends in his perfunctory opening brief that the ALJ erred by failing to consider the vocational expert's response to the final hypothetical (posed by Burney's attorney rather, not the ALJ) that there would be no jobs available for a hypothetical individual who had severe visual limitations consistent with Burney's testimony.  Burney's argument, however, is unavailing, as the ALJ ultimately found Burney's testimony of debilitating

13

limitations "not entirely persuasive";[9] consequently, the ALJ determined that Burney's RFC was better encompassed by the limitations expressed in one of the ALJ's own hypotheticals. *See* 20 C.F.R. § 404.1527(e)(1) (articulating that the final responsibility for deciding the claimant's RFC and whether he is disabled is "reserved to the Commissioner").  Therefore, the ALJ committed no legal error by not considering the vocational expert's answer to the hypothetical posed by Burney's attorney.

In summary, the RFC assigned to Burney by the ALJ was consistent with the opinions of Burney's treating physicians, and the ALJ adequately explained his reasoning for adopting only a portion of Dr. Whiteleather's opinion.  Clearly, the ALJ's decision does not contain legal error and is supported by substantial evidence; thus it will be affirmed.

## V.  CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is AFFIRMED.  The Clerk is directed to enter a judgment in favor of the Commissioner and against Burney.

SO ORDERED.

Enter for this 26th day of March, 2007.

S/Roger B. Cosbey<br>
Roger B. Cosbey,<br>
United States Magistrate Judge

---

[9] In rendering his credibility determination, the ALJ took note of the objective medical evidence of record and Burney's varied activities of daily living, including that, despite his alleged visual limitations, Burney often spends part of his day "watch[ing] cars on Paulding Road." (Tr. 12.)